# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                    No. CR 04-2362 JB

JAMES SANDOVAL
a/k/a JAMES PHILLIP SANDOVAL,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant's Statement of Objections to Presentence Report and Addendum Disclosed on September 27, 2006, filed October 6, 2006 (Doc. 178)("Defendant's Objections II"); and (ii) the United States' Motion for Upward Departure, filed October 16, 2006 (Doc. 179)("Upward Departure Motion"). The Court heard these objections at the sentencing hearing held November 7, 2006. The primary issues are: (i) whether the Court should consider information relating to uncharged, dismissed, and acquitted conduct that the United States Probation Office ("UPSO") included in the Pre-Sentence Report ("PSR"); and (ii) whether, based upon that information, the Court should use U.S.S.G. § 2A3.1, rather than § 2A3.4, to determine the base offense level. Because the Court believes it should consider all the information in the PSR, but does not believe it should use all the conduct originally charged to determine the offense level, the Court will sustain Defendant James Sandoval's objections in part and deny them in part. Because the Court believes that this case is within the heartland of relevant cases, it will deny the United States' request for an upward departure.

**FACTUAL BACKGROUND**

1.      **Uncharged 1992 Incident with Jane Doe B.**

On or about February 1993, Pamela Garcia and Sandoval were sleeping in bed with Jane Doe B. See PSR ¶ 21, at 7-8. When Garcia looked over toward Sandoval, he had his erect penis out and was rubbing it against Jane Doe B's foot when she was asleep. See id. Garcia shouted at Sandoval and asked him what he was doing.   Sandoval said he thought he had been rubbing his penis against Garcia. See id. In the summer of 2004, Garcia told Sandoval that he should "own-up" to what he had done to Jane Doe B, and he asked for forgiveness. See id. ¶22, at 8. Sandoval told Garcia that thinking about what he had done made him want to throw up. See id.

2.      **Charged Conduct.**

Andrea Bedoni has enrolled all four of her children, including the three Sandoval fathered, as members of the Navajo Nation rather than as members of the Pueblo of San Felipe. See Hearing Transcript at 71:14-18 (Fisher)(taken November 7, 2006)("Hearing Transcript").[1]

On September 1, 2004, Bedoni was awakened at approximately 4:15 a.m. See PSR ¶ 11, at 5. At the time, Bedoni was in bed with Sandoval and their two youngest children. See id. When Bedoni woke up, she asked Sandoval why Jane Doe was lying beside him, and Sandoval replied: "I don't know." Id. Bedoni noticed that Sandoval's other fist was by Jane Doe's waistline. See id. Bedoni confronted Sandoval, and Sandoval changed his story. See id.

On September 9, 2005, an agent with the Federal Bureau of Investigation interviewed Jane Doe. See id. ¶ 9, at 4. Jane Doe disclosed that Sandoval had touched her "peepee" on the skin with

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

his finger.  See id.  Jane Doe said she felt sad and her "peepee" hurt all day.  Id.  Jane Doe also disclosed that Sandoval had her touch his "peepee" with her mouth several times, and she demonstrated this act by holding her mouth wide open.  Id.  Jane Doe said Sandoval would move his "peepee" when she had her mouth on it.  Id.  Jane Doe said his "peepee" was soft and big, and that it would go a long way into her mouth.  Id.  Jane Doe said that "sticky stuff" came out of his "peepee."  Id.  Bedoni also told the FBI agent that Jane Doe told a parent volunteer that "Daddy pushed my buttons" and that "Daddy said he was going to butter the hair."  PSR ¶ 13, at 6.

On September 9, 2004, an FBI agent interviewed Pamela Garcia.  She disclosed that Jane Doe clung to her vehicle when Garcia attempted to drop Jane Doe off with Sandoval in June 2004.  See id. ¶ 14, at 6.

## PROCEDURAL BACKGROUND

### 1.    The Trial.

The United States represents that it could not prosecute Sandoval for the alleged act involving Jane Doe B based upon applicable law.  See United States' Response to the Defendant's Statement of Objections to Presentence filed on September 15, 2006, filed September 28, 2006 (Doc. 176)("Response").

The jury was presented with all admissible evidence that the United States contended proved that Sandoval had committed the greater offenses of aggravated sexual abuse.  The jury's verdict rejected the more serious charges of aggravated sexual abuse.  Even though the Court, in pretrial rulings, had indicated it would allow Jane Doe B to testify at trial, Jane Doe B did not testify at trial, because she was in Europe at the time.  See Trial Transcript at 10:4-7 (Winder)(taken June 22, 2006).  Pamela Garcia testified at trial, but only as to her observation of the event in June 2004, which did

not include any sexual act or contact.

At trial, the Court and/or the jury considered all eight counts in the Redacted Second Superseding Indictment. The Counts in the Indictment and the two Superceding Indictments were subject to many variations and several rulings by the Court. At the time of the jury charge, the Court initially instructed the jury with respect to four Counts: Counts 1 and 3 (corresponding to Counts 1 and 7 of the Redacted Second Superseding Indictment), alleging abusive sexual contact in, respectively, September and June 2004, and Counts 2 and 4 (corresponding to Counts 2 and 8 of the Second Superceding Indictment), alleging aggravated sexual abusive contact in, respectively, September and June 2004. See Instruction No. 8, at 9-10. The Court then instructed the jury as to the required elements for abusive sexual contact. See Instruction No. 9, at 11.

The Court next instructed the jury as to the required elements for aggravated sexual abuse. See Instruction No. 11, at 13. This Instruction defined the alleged sexual act, an element of aggravated sexual abuse, as "intentional touching, not through clothing, of the genitalia of [Jane Doe] . . . ," a part of the definition of "sexual act" in 18 U.S.C. § 2246(2)(D). See Instruction No. 9. The Court then instructed the jury as to the required elements for attempting to commit aggravated sexual abuse, as well as instructing the jury that they could find Sandoval guilty of abusive sexual contact. See Instruction No. 12, at 15.

After the jury commenced its deliberations, and following further discussions between the Court and counsel, the Court dismissed Counts 1 and 3 as they appeared in Instruction No. 8. The Court then gave Supplemental Jury Instruction No. 1, and the Court substituted a replacement Verdict Form for the verdict form it initially provided the jury. Supplemental Jury Instruction No. 1 is directed toward the remaining Counts 2 and 4, alleging aggravated sexual abuse. See

Supplemental Instruction No. 1 at 2, filed June 22, 2006.

In the first paragraph, Supplemental Jury Instruction No. 1 states that, if the jury were to acquit or were unable to agree on a verdict with respect to aggravated sexual abuse as charged in Counts 2 and 4, it could consider abusive sexual contact as a lesser included offense.  See id. Supplemental Jury Instruction No. 1 also clarifies a distinction between the greater offense of aggravated sexual abuse and the lesser included offense of abusive sexual contact.  See id.  In the second paragraph, the Court states: "The difference between these two offenses is that, to convict Mr. Sandoval of Abusive Sexual Contact, the government does not have to prove that the intentional touching was not through clothing."  Id.

The Verdict Form likewise required the jury to first consider the greater offense of aggravated sexual abuse committed in or about September 2004 as charged in Count 2.  See Verdict, Question 1, at 1.  If the jury found that the United States had failed to prove Sandoval committed the completed offense of aggravated sexual abuse, it would then have to consider, as Instruction No. 12 directed, attempting to commit aggravated sexual abuse.  See id., Question 2, at 1.  If the jury also found that the United States had failed to prove Sandoval committed the attempted offense of aggravated sexual abuse, it was then to consider the lesser included offense of abusive sexual contact. See id., Question 1A, at 1.  The Court also required the jury to follow an identical process with respect to aggravated sexual abuse, attempted aggravated sexual abuse, and the lesser included offense of abusive sexual contact, committed in or about June 2004, as charged in Count 4.  See id., Question 2 and 2A, at 1-2.

The jury found Sandoval not guilty of both the greater offenses of aggravated sexual abuse and attempted aggravated sexual abuse.  See id., Questions 1 and 2, at 1.  The jury also found

Sandoval not guilty of the lesser included offense of abusive sexual contact, as charged in Count 4, committed in or about June 2004. See id., Question 2A, at 2. The jury found Sandoval guilty of the lesser included offense of abusive sexual contact, as charged in Count 2, committed in or about September 2004. See id., Question 1A, at 1. The Court either dismissed the remaining counts or they resulted in not guilty verdicts from the jury.

2.     **The PSR.**

To most adequately determine if restitution is applicable in this case, the USPO asked Jane Doe and Bedoni how this offense has impacted them physically, emotionally, and financially. Based on information that Bedoni provided during the Victim Impact Interview conducted on July 27, 2006, the USPO determined that restitution could not be requested. The information in paragraph 33 of the PSR was all that Bedoni provided regarding bills or other costs that remained outstanding after Sandoval's arrest.

The United States did not file any objections to the PSR regarding Sandoval. Sandoval, through his attorney, filed his Statement of Objections to the PSR on September 15, 2006, and served it on the United States' counsel, Assistant United States Attorney Samuel L. Winder. See Defendant's Objections II at 1; Addendum to the Pre-Sentence Report at 1, issued September 26, 2006 ("Addendum"). Sandoval reviewed the file, however, and realized that, through an oversight, he did not file the Statement of Objections with this Court. See id.

On September 26, 2006, the USPO prepared a response and disseminated it to both attorneys assigned to the case. By way of formal Addendum, the USPO addressed all of the issues presented to date. See Addendum. The Addendum references and attempts to address the Defendant's Statement of Objections to the September 1, 2006 PSR.

Sandoval offers objections in writing to the PSR, dated September 1, 2006, and the Addendum thereto, dated September 26, 2006. See Defendant's Objections II. Sandoval attached a copy of the Defendant's Statement of Objections, dated September 15, 2006, to his Statement of Objections to Presentence Report and Addendum Disclosed on September 27, 2006. Sandoval reiterates the objections in the September 15 Objections and incorporates them into his October 6 Objections by reference. See id. at 1-2.

The United States filed a motion for upward departure from Sandoval's suggested offense level of 16. See Upward Departure Motion at 1-2; Defendant's Sentencing Memorandum at 2, filed November 6, 2006 (Doc. 180)("Sentencing Memo").

As appears from the letter from the former War Chief of the Pueblo of San Felipe, Michael Sandoval, it may be that Bedoni and her children have no right, under tribal law, to stay on the Pueblo because they are not enrolled as members of the San Felipe Pueblo. See Letter from Michael Sandoval to the Court at 3, dated September 29, 2006. The Pueblo Governor has apparently agreed, exceptionally to date, to let Bedoni and her children remain on the Pueblo. See id. Michael Sandoval believes the Governor and the Tribal Council have made this exception out of respect for Sandoval. See id.

## SENTENCING LAW AND GUIDELINES

### 1.    Constitutionality of Considering Relevant Conduct and the Applicable Evidentiary Standard.

In a sentencing proceeding, the United States need only prove the existence of a fact relevant to sentencing by a preponderance of the evidence, rather than beyond a reasonable doubt. The recent upheavals in federal sentencing jurisprudence has not affected the preponderance standard for

sentencing proceedings in the Tenth Circuit.  Moreover, acquitted conduct may fairly be used as relevant conduct so long as the preponderance standard is satisfied.

The Supreme Court of the United States has expressly and repeatedly approved of reliance upon acquitted conduct.  The practice is, in essence, an artifact of the lower burden of proof that has always been applicable to sentencing proceedings.  Furthermore, the use of acquitted conduct for sentencing purposes is consistent with Fifth Amendment due process and the Sixth Amendment right to jury trial.  The Supreme Court and the United States Court of Appeals for the Tenth Circuit have already both definitively spoken on this issue.

In Witte v. United States, 515 U.S. 389 (1995), the Supreme Court upheld the use of uncharged conduct at sentencing against a double jeopardy challenge.   The Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which defendant was convicted."  Witte v. United States, 515 U.S. at 401. Rather, the defendant is "punished only for the fact that the present offense was carried out in a manner that warrants increased punishment . . . ." Id. at 403.

In United States v. Watts, 519 U.S. 148 (1997), the Supreme Court upheld the use at sentencing of conduct for which a defendant is acquitted against a double jeopardy challenge.  The Supreme Court ruled that a judge may consider evidence of conduct for which a defendant is acquitted in arriving at a sentence.  See id. at 155-58.  The Supreme Court decided, in a per curiam opinion, that in a federal case in which the accused had been convicted on one charge and acquitted on another charge, the jury's verdict of acquittal did not prevent the sentencing court from considering the accused's conduct underlying the acquittal charge.  The Supreme Court began its

opinion by stating that every Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- has held that a sentencing court may do so, if the government establishes that conduct by a preponderance of the evidence.  See id. at 149.[2]

There were two Ninth Circuit cases on appeal in United States v. Watts.  In United States v. Watts, despite Watts' acquittal on the firearms count, the district court found by a preponderance of the evidence that Watts had possessed the guns in connection with the drug offense.  See id. at 150. In United States v. Putra, the district court explained that the second sale was relevant conduct under U.S.S.G. § 1B1.3, and it therefore aggregated the amounts of both sales in calculating Putra's base offense level under the Guidelines.  See 519 U.S. at 151.  The Ninth Circuit had vacated and remanded both cases.

The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661:  "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661; See 519 U.S. at 151.  According to the Supreme Court, "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 152.  The Supreme Court reiterated the different limitations on the presentation of evidence at trial and at sentencing:  "'Highly relevant -- if not essential -- to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'"  Id. at 151-52 (quoting Williams v. New York, 337 U.S. 241, 247 (1949)).  The Supreme Court noted that, under the pre-Guidelines sentencing

_____

[2] In a footnote at that point in the opinion, the Supreme Court cited United States v. Coleman, 947 F.2d 1424, 1428-1429 (10th Cir. 1991), cert. denied, 503 U.S. 972 (1992).

regime, it was "'well established that a sentencing judge may take into account facts introduced at trial relating to other charges, even ones of which the defendant has been acquitted.'" United States v. Watts, 519 U.S. at 152 (quoting United States v. Donelson, 695 F.2d 583, 590 (D.C. Cir. 1982)(Scalia, J.)).

The Supreme Court in United States v. Watts then turned to the Guidelines.  The Supreme Court found that the Guidelines conclude that "'relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for these offenses.'"519 U.S. at 153 (quoting U.S.S.G. § 1B1.3 comment., backg'd).  The Supreme Court stated that, "[i]n short, we are convinced that a sentencing court may consider conduct of which a defendant has been acquitted."  519 U.S. at 154.

The Watts Court then spent considerable time stating why its ruling did not conflict with its double jeopardy jurisprudence.  The Supreme Court stated that, as it explained in Witte v. United States, sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction. See United States v. Watts, 519 U.S. at 154 (citing Witte v. United States, 515 U.S. at 395).  The Supreme Court in United States v. Watts, stated that it had explained that "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt.'"  519 U.S. at 155 (quoting United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361 (1984)).  "'An acquittal is not a finding of any fact.  An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt.  Without specific jury findings, no one can logically or realistically draw any factual

finding inferences . . . ."  United States v. Watts, 519 U.S. at 155 (quoting United States v. Putra, 78 F.3d 1386, 1394 (9th Cir. 1996)(Wallace, C.J., dissenting)).  The Supreme Court stated "the jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict of not guilty." United States v. Watts, 519 U.S. at 155.  The Supreme Court noted that "it is impossible to know exactly why a jury found a defendant guilty on a certain charge."  Id.  See id. at 157 ("The acquittal sheds no light on whether a preponderance of the evidence established [a defendant's] participation in that transaction.").

In United States v. Watts, the Supreme Court stated that, for these reasons, "'an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof.'"  519 U.S. at 156 (quoting Dowling v. United States, 493 U.S. 342, 349 (1990)).  The Supreme Court acknowledged, however, a divergence of opinion among the Circuits whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear-and-convincing evidence.  See United States v. Watts, 519 U.S. at 156 n.2.  In footnote two, the Supreme Court cited cases from the Supreme Court and from the First, Second, Third, Seventh, Eighth, Ninth, and the District of Columbia Circuits.  See, e.g., United States v. Lombard, 72 F.3d 170, 186-87 (1st Cir. 1995)(authorizing downward departure in "an unusual and perhaps a singular case" that may have "exceeded" constitutional limits, where acquitted conduct calling for an "enormous" sentence enhancement "is itself very serious conduct," "where the ultimate sentence is itself enormous, and where the judge is seemingly mandated to impose that sentence"); United States v. Tounley, 929 F.2d 365, 369 (8th Cir. 1991)("At the very least, McMillan [v. Pennsylvania, 477 U.S. 79, 91-92 (1986),] allows for the possibility that the preponderance standard the Court approved for garden variety

-11-

sentencing determinations may fail to comport with due process where, as here, a sentencing enhancement becomes 'a tail which wags the dog of the substantive offense.'")(quoting McMillan v. Pennsylvania, 477 U.S. at 88); United States Restrepo, 946 F. 2d 654, 656 n.1 (9th Cir. 1991)(en banc)(suggesting that clear-and-convincing evidence might be required for extraordinary upward adjustments or departures), cert. denied, 503 U.S. 961 (1992). The Tenth Circuit, however, which has rejected a higher standard, created the split in the circuits. See United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1990)("At least as concerns making guideline calculations the issue of a higher than a preponderance standard is foreclosed in this circuit."), cert. denied, 511 U.S. 1020 (1994). In the end, the Supreme Court in United States v. Watts reversed the Ninth Circuit and held that even "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquittal charge, so long as the conduct has been proved by a preponderance of the evidence." 519 U.S. at 157.

If there were any doubt about where the Tenth Circuit stood after United States v. Watts and United States v. Washington, Judge McConnell, writing for a panel with Judges Lucero and Murphy, ended the debate in United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005). In United States v. Magallanez, the Tenth Circuit held that Blakely v. Washington, 542 U.S. 296 (2004), and United States v. Booker, 543 U.S. 220 (2005), had not changed the district court's enhancement findings/analysis, and that United States v. Watts retained vitality. United States v. Magallanez involved plain error review of a drug sentence in which a jury, after rendering its verdict, through special interrogatory, attributed to the defendant 50-500 grams of methamphetamine, but the judge at sentencing attributed 1200 grams of methamphetamine to him. In United States v. Magallanez, the jury made findings that (i) the defendant was guilty; and (ii) that a certain quantity of drugs should

be attributed to him.  The jury was given a special interrogatory for purposes of determining the quantity of drugs attributable to Magallanez.  See id. at 682.  There were three ranges available:  0-50 grams, 50-500 grams, and over 500 grams.  See id.  The jury found 50-500 grams.  The district judge in United States v. Magallanez accepted the jury's findings of guilt, but found a higher quantity of drugs -- 1.21 kilograms -- should be used for sentencing.  The district court made this determination by adding together the various amounts that government witnesses testified they had sold to Magallanez.  The district court stated: "[This] is the amount that the government has proven to the Court's satisfaction.  Frankly, they proved it beyond any doubt in my mind but certainly 'by a preponderance of the evidence' standard."  Id. at 682.  A sentence based on the jury's finding was 63-78 months; a sentence based on the judge's finding was 121-151 months.

Magallanez argued that the district court's additional findings with respect to the amount of drugs attributable to him violated Blakely v. Washington.  The Tenth Circuit acknowledged the Supreme Court's decisions in Blakely v. Washington and United States v. Booker, but because Magallanez did not raise his Blakely/Booker argument at trial or sentencing, the Tenth Circuit reviewed the district court's decision for plain error.  On appeal, Magallanez argued that Blakely v. Washington and United States v. Booker required the district court to accept the jury's finding of drug quantity.

The Magallanez court emphasized that the district judge had determined "beyond any doubt" that the sentencing enhancements should be applied.  See id. at 677.  The Tenth Circuit discussed in its opinion, however, that the preponderance standard governed at sentencing and noted that the district judge's different determination of the drug quantity from what the jury found was proper.

Judge McConnell then responded to Magallanez' argument, stating:

> The defendant in this case might well be excused for thinking that there is something amiss, under this constitutional principle, with allowing the judge to determine facts on which to sentence him to an additional 43 months in prison in the face of a jury verdict finding facts under which he could be required to serve no more than 78 months.

408 F.3d at 683-84.  The Tenth Circuit stated that, after passage of the Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict.  See id. at 684.  The Tenth Circuit noted that the Supreme Court reversed two decisions of the Ninth Circuit holding that "'sentencing courts could not consider conduct of the defendants' underlying charges of which they had been acquitted.'"  See id. (quoting United States v. Watts, 519 U.S. at 149).  The Tenth Circuit found significant that the Supreme Court  had held that the lower court decisions conflicted not only with the Sentencing Guidelines, but with the "'clear implications of 18 U.S.C. § 3661.'"  See United States v. Magallanez, 408 F.3d at 684 (quoting United States v. Watts, 519 U.S. at 149).  The Tenth Circuit, after quoting the Supreme Court's statement that the Guidelines did not alter 18 U.S.C. § 3661, stated that it follows that the Supreme Court's partial invalidation of the Guidelines in United States v. Booker could not have altered it, either.

Judge McConnell explained that the decision in United States v. Watts was predicated on the rationale that "'different standards of proof . . . govern at trial and sentencing.'"  United States v. Magallanez, 408 F.3d at 684 (quoting United States v. Watts, 519 U.S. at 155).  The Tenth Circuit stated that an acquittal by the jury proves only that the defendant was not guilty beyond a reasonable doubt.  See 408 F.3d at 684.  The Tenth Circuit noted that, both before and under the Guidelines, facts relevant to sentencing have generally been found by a preponderance of the evidence.  See id. The Tenth Circuit concluded that a jury verdict of acquittal on related conduct, therefore, "'does not

prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct  has been proved by a preponderance of the evidence.'" Id. (quoting United States v. Watts, 519 U.S. at 157).

Judge McConnell stated that "[n]othing in Booker changes this analysis." United States v. Magallanez, 408 F.3d at 684.  At the end of that sentence, Judge McConnell included his only footnote in the opinion.  The Tenth Circuit acknowledged in that footnote that Justice Stevens in United States v. Booker, on the merits, had indicated that United States v. Watts did not involve analysis of Sixth Amendment issues and that "'[n]one of our prior cases is inconsistent with today's decision.'" United States v. Magallanez, 408 F.3d at 685 n.1 (quoting United States v. Booker, 125 S.Ct. at 754).  Judge McConnell noted that Justice Stevens, in a footnote, described United States v. Watts as presenting a very narrow question regarding the interaction of the Guidelines and the Double Jeopardy Clause.  See United States v. Magallanez, 408 F.3d at 685 n.1.  Judge McConnell concluded that Justice Stevens' footnote did not change United States v. Watts and stated that it could not "overrule" United States v. Watts: "Nonetheless, the statement in the text demonstrates that Watts remains good law, and it is not the place of an inferior court to overrule it.  See Agostini v. Felton, 521 U.S. 203, 237-38 . . . (1997)." United States v. Magallanez, 408 F.3d at 685 n.1.

In the text, Judge McConnell continued: "18 U.S.C. § 3661, which underlay the decision in Watts, remains in full force." United States v. Magallanez, 408 F.3d at 684.  Judge McConnell stated that, to be sure, after United States v. Booker, the Guidelines do not bind sentencing courts; the Guidelines have become "effectively advisory." United States v. Magallanez, 408 F.3d at 685 (quoting United States v. Booker, 125 S.Ct. at 757).  Judge McConnell noted, however, that in sentencing criminal defendants in federal crimes, district courts are still required to consider Guideline

-15-

ranges, which are determined through application of the preponderance standard, just as they were

before.  See United States v. Magallanez, 408 F.3d at 685.  Judge McConnell stated that the "only

difference" is that the court has latitude, subject to reasonableness review, to depart from the resulting

Guideline ranges.  See id. at 685.  Like every other Circuit Court to consider the issue since United

States v. Booker, the Tenth Circuit through Judge McConnell concluded:

> Applying the logic of Watts to the Guidelines system as modified by Booker, we
> conclude that when a district court makes a determination of sentencing facts by a
> preponderance test under the now-advisory Guidelines, it is not bound by jury
> determinations reached through application of the more onerous reasonable doubt
> standard.  In this respect, the prior Guidelines scheme is unchanged by the seeming
> revolution of Booker.

United States v. Magallanez, 408 F.3d at 685.  See United States v. Cage, 451 F.3d at 592

(describing United States v. Booker as "a decision that struck down judicial fact-finding [yet] resulted

in a system where judges had more rather than less discretion").

Based on the foregoing, within the Tenth Circuit, a court can consider uncharged, dismissed,

and acquitted conduct that a preponderance of the evidence supports in determining whether to

enhance a sentence.  See United States v. Magallanez, 408 F.3d at 685.  Moreover, pursuant to 18

U.S.C. § 3661,  "No limitation shall be placed on the information concerning the background,

character, and conduct of a person convicted of an offense which a court of the United States may

receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.

Additionally, a court may consider reliable hearsay under the preponderance of the evidence standard.

See U.S.S.G. § 6A1.3.

### 2.      Restitution: 18 U.S.C. § 3663A(a)(1) and (2).

Pursuant to 18 U.S.C. § 3663A(a)(1) and (2), a court shall order that the defendant make

restitution to the victim or the victim's guardian if the victim is under 18 years of age and if the offense of conviction is a crime of violence.

## ANALYSIS

The Court will sustain some of the formal objections to the PSR and Addendum, and overrule others. The Court will deny the United States' request for an upward departure.

## I.   THE COURT WILL CONSIDER SANDOVAL'S SEPTEMBER 15, 2006 OBJECTIONS.

Sandoval's counsel asks that, if the Court deems it necessary to separately file the original Statement of Objections dated September 15, 2006, the Court give him leave to do so. The Court grants him that leave, but it is unnecessary. The Court has a copy of the September 15 Objections, the USPO has considered them, and the Court will consider them.

### 1.    PSR ¶ 8, at 4.

The PSR states that both the victim and Sandoval are enrolled members of the Navajo Nation. Sandoval contends that he is not an enrolled member of the Navajo Nation, but is an enrolled member of the Pueblo of San Felipe. See Defendant's Statement of Objections to Pre-Sentence Report Disclosed on September 5, 2006 at 1, filed October 6, 2006 (attached to Defendant's Objections II)("Defendant's Objections I"). The USPO states that, by way of the Addendum, it will correct the information in the PSR. See Addendum at 1. Given that the USPO has corrected the PSR, the Court will overrule this objection and correction regarding factual matters as moot.

### 2.    PSR ¶¶ 9-14, at 4-6.

Sandoval contends that the section of the PSR that is entitled "The Offense Conduct" barely addresses the conduct involved in the offense for which the jury found him guilty. See Defendant's

Objections I at 1-2.  Sandoval asserts that the inclusion of information presented in these paragraphs is inappropriate and irrelevant for the purpose of sentencing.  See id.  Sandoval states that the section entitled "Offense Conduct" should not include any mention of the charges of aggravated sexual abuse and aggravated sexual contact with the victim, because the jury rejected these allegations.  See id. Sandoval contends that it is inappropriate to review and consider any of the allegations of various sexual acts that would have suggested the more serious charges of aggravated sexual abuse.  See id.

The information set forth in the PSR provides the Court information concerning Sandoval's background, character, and conduct.  Pursuant to 18 U.S.C. § 3661 and U.S.S.G. § 1B1.4, the Court may consider, without limitation, any information concerning Sandoval's background, character, and conduct.  See U.S.S.G. § 1B1.4  Accordingly, it is proper for the Court to consider the information that the United States Attorney's Office has provided the Court through discovery.  Notwithstanding that Sandoval was not convicted of the more serious crime, it is proper for the Court to consider this information with regard to sentencing.

The USPO also maintains that the information is reliable information based on the available discovery.  See Addendum at 2.  The USPO states that any possible verification of the information with the Assistant United States Attorney was completed and acknowledges the allegations in the Redacted Second Superseding Indictment, which allegedly occurred between June 2004 and September 2004.  See id.  The USPO further states that the information presented to the Grand Jury in this case was factually sufficient to warrant the Redacted Second Superseding Indictment in Counts 1 through 8, all of which allege the elements of offenses that required Sandoval to answer to the allegations.  See id.

The USPO contends that it provided the PSR to the Court based on the local rules, as well

as on the Administrative Office of the Courts' national standards and guidelines, which provide a format consistent with congressional, statutory, and sentencing guideline provisions and authority. See id. Moreover, the information neither enhances Sandoval's statutory maximum penalty, nor any departure outside of the applicable guideline range. See id.

Although Sandoval was convicted of the lesser included offense in Count 2, pursuant to U.S.S.G. § 1B1.4, 18 U.S.C. § 3661, United States v. Watts, and Witte v. United States, the other information alleged in Count 1 and Counts 3-8 is relevant to sentencing, and nothing restricts the sentencing judge from considering that information. The Court will, therefore, overrule the objection.

### 3.    PSR ¶ 14, at 6.

Sandoval objects to paragraph 14 of the PSR, because, he argues, it is inappropriate for the Court to consider any of Jane Doe B's and Garcia's allegations. See Defendant's Objections I at 2. Sandoval contends that their statements are inadmissible hearsay and grossly prejudicial. See id. Pursuant to U.S.S.G. § 1B1.4, 18 U.S.C. § 3661, United States v. Watts, and Witte v. United States, the Court will overrule the objection and consider the information.

### 4.    PSR ¶¶ 17-23, at 6-8.

Sandoval contends that the information presented in the section entitled "Offense Behavior Not Part of Relevant Conduct" is not pertinent to sentencing, as the information takes into consideration uncharged allegations that other witnesses made. See id. at 2-3. Specifically, Sandoval contends it is inappropriate to consider any of the allegations of uncharged offenses that either Jane Doe B or Garcia made against him. See id.

It is proper for the Court to consider this information to ascertain Sandoval's life and background. Regarding the issues raised in paragraphs 17-23 of the PSR, "Offense Behavior Not

Part of the Relevant Conduct," the USPO maintains the information has sufficient indicia of reliability and that it is necessary in fully gauging the brevity of Sandoval's conduct within the time period specific in Counts 1 through 8 of the Redacted Second Superseding Indictment.  See Addendum at 2.

The Court will consider the information.  Based upon U.S.S.G. § 1B1.4, 18 U.S.C. § 3661, United States v. Watts, and Witte v. United States, the Court will overrule the objection.

### 5.    PSR ¶ 56, at 16.

Sandoval contends that he had contact with Jane Doe B in November 2005, because Jane Doe B went to Sadie's Restaurant where Sandoval was working at La Pasada Halfway House's direction. See Defendant's Objections I at 4.  Sandoval alleges that he immediately reported this contact to his Pre-Trial Services Officer, to his attorney, and, through his attorney, to Mr. Winder.  See id.

The Court believes that amendments to the PSR make clear that Sandoval's contact with Jane Doe B was not at his instigation.  As such, the Court will overrule the objection as moot.

### 6.    PSR ¶¶ 24-35, at 9-11.

Sandoval objects to the inclusion of the section entitled "Victim Impact Statement," as no restitution is being requested at this time.  See Defendant's Objections I at 4.   Because restitution is not requested, see id. ¶ 97, at 25, Sandoval is unsure upon what basis the USPO included this entire section, entitled "Victim Impact Statement," see Defendant's Objections I at 4.

The Court understands that restitution is not being sought; however, pursuant to U.S.S.G. § 1B1.4, 18 U.S.C. § 3661, United States v. Watts, and Witte v. United States, the Court believes that it may consider this information.  The Court will, therefore, overrule the objection.

     7.     **PSR ¶ 28, at 9.**

Sandoval objects to paragraph 28 of the PSR, because, he argues, it allows Bedoni to complain about the unwillingness of his family to maintain contact with the children. See Defendant's Objections I at 4. Bedoni complains that "it has only been until recently [sic] that one or two of the defendant's family members will speak or wave 'hello' to the children." PSR ¶ 28, at 9. Bedoni's statement that Sandoval's family only recently began speaking or waving to them was her way of explaining that she and her children were ostracized within the Pueblo of San Felipe for a long period of time after Sandoval was arrested for this offense. Sandoval states that his conditions of release prohibited him from having contact, directly or indirectly, with Bedoni and the children. See Defendant's Objections I at 4. Sandoval contends that contact by his family members might be construed as indirect contact on Sandoval's behalf. See id.; cf. PSR ¶ 58, at 17.

Given that Sandoval has now had the opportunity, through the Addendum, to state his position on the matter, the Court believes that this objection is moot and will, therefore, overrule it.

     8.     **PSR ¶ 33, at 11.**

As stated in paragraph 33, Bedoni withdrew a substantial amount of money from her retirement account to support her children. Sandoval objects to paragraph 33 of the PSR, because it implies that he left Bedoni and their children in financial hardship. See Defendant's Objections I at 4-5. Sandoval contends that he did not choose to leave Bedoni and the children struggling financially. See id.

Given that Sandoval has supplemented the PSR with information concerning the matter addressed in paragraph 33 of the PSR, the Court believes that this objection is moot and will, accordingly, overrule it.

9.      **PSR ¶ 59, at 17**.

Sandoval objects to paragraph 59 of the PSR, because, he contends, it lacks necessary context.  Sandoval states that the questions in the PSR interview asked him to identify only those persons with whom he had been sexually intimate.  See Defendant's Objections I at 9.  Thus, Sandoval contends, in the August 11, 2006 letter from his counsel to the USPO, he identified only Carmella Tenorio of Santa Domingo Pueblo as a woman with whom he had sexual intimacy.  See id.

The Court believes that Sandoval has supplemented the paragraph and that the objection is now moot.  As such, the Court will overrule the objection.

10.      **PSR ¶ 66, at 19**.

Sandoval seeks to highlight that, in the August 11, 2006 letter from his counsel to the USPO, with reference to the questions regarding masturbation, he reiterated that when he was an adolescent he was already involved in the spiritual life and practices of his tribe and Pueblo.  See id. at 9.  The USPO, by way of the Addendum, amends paragraph 66 of the PSR to include the statement that Sandoval was already involved in the spiritual life and practices of his tribe and of the Pueblo during his adolescence, thus influencing the issue of masturbation in his formative years.  The Court thus overrules the objection to paragraph 66 as moot.

11.      **PSR ¶¶ 79-81, at 22**.

Paragraphs 79-81 detail financial information pertaining to Sandoval as provided in his credit report.  See PSR ¶¶ 79-81, at 22.  Sandoval contends that various issues in paragraphs 79-81 require clarification.  See Defendant's Objections I at 9-10.  Sandoval states that his conditions for release prevent him from receiving any information regarding his accounts and indebtedness, and prohibit him from continuing in his former employment,  making him unable to meet the full extent of his financial

obligations.  See id.  In its Addendum, the USPO recognizes that changes in Sandoval's custodial and employment status have impacted his financial obligations.  The Court thus overrules the objection to paragraphs 79-81 of the PSR as moot.

### 12.    PSR ¶ 98, at 25.

In paragraph 98, Sandoval suggests that he may submit a sentencing memorandum that might identify factors warranting a sentence below the advisory guidelines.  See PSR ¶ 98, at 25; Defendant's Objections I at 10.  Paragraph 98 simply seems to indicate that Sandoval may submit a sentencing memorandum.  See PSR ¶ 98, at 25.  To the extent that this is an objection, the Court overrules it as moot.

### 13.    Six Letters of Reference Pertaining to Sandoval.

Sandoval objects to the fact that six letters of reference were neither attached to, nor mentioned in, the PSR.  See Defendant's Objections I at 10.  The Court has received and reviewed the letters, and will thus overrule the objection as moot.

### 14.    Letter from Dr. Godner.

Sandoval seeks to have the letter from Dr. Godner removed from the Addendum.  See Defendant's Objections II at 3.  Sandoval argues that, with considerable sadness, his family members have faithfully observed the restrictions that his conditions of release set; his family cannot have contact with his male children by Bedoni – their grandchildren, nephews, and cousins.  See id.

The Court will overrule the objection and consider the letter as additional information.

# I.     **OFFENSE LEVEL COMPUTATION.**

Sandoval objects to the Offense Level Computation and contends that the guideline range is directly tied to § 2A3.4 of the 2003 Sentencing Guidelines.  Sandoval indicates that the special offense characteristics and the cross-reference used in calculating the Offense Level Computations are inappropriate, because the victim was not entrusted to him at the time of the offense, and because the Court, the United States, or the jury had dismissed the charged conduct.  The Court does not concur with the USPO regarding the offense level computation and thus will sustain Sandoval's objections to it in part and overrule them in part.

## A.     **USE OF U.S.S.G. § 2A3.4(C)'S CROSS-REFERENCE.**

Sandoval argues that, in light of the verdicts, U.S.S.G. § 2A3.4(c)(1)'s cross-reference to § 2A3.1, Criminal Sexual Abuse, is inapplicable to establishing the advisory guidelines sentencing range.  See Sentencing Memo at 5.  Sandoval contends that the jury's verdict expressly rejects any completed or attempted sexual act, a necessary element of aggravated sexual abuse.  See id.  He maintains that the verdict does not include any finding, and expressly rejects, that the offense for which Sandoval is to be sentenced involved conduct described in 18 U.S.C. § 2241 -- use of force, threat, or other means.  See id.  Sandoval argues that without either threats or a completed or attempted sexual act, the verdict cannot be said to have involved conduct described in 18 U.S.C. § 2242. See id.  Sandoval states that, as such, it is inappropriate to use the § 2A3.4(c) cross-reference, see id., because his offense does not "involve criminal sexual abuse or attempt to commit criminal sexual abuse (as defined in 18 U.S.C. § 2241 or § 2242 . . . )," U.S.S.G. § 2A3.4(c)(1).

The United States contends that, based upon the information set forth in the PSR, the Court "could" apply § 2A3.4(c)(1).  Response at 1.  As noted in the PSR, it is only the Count of conviction

that the USPO has used to establish Sandoval's base offense level, specific offense characteristics, and any applicable cross-references or enhancements.  See PSR ¶¶ 36-45, at 12-13.

The Court finds that the cross-reference is operative when the offense involved criminal sexual abuse or attempt to commit criminal sexual abuse.[3]  See U.S.S.G. § 2A3.4(c)(1).  The Court does not, however, find by a preponderance of the evidence that there was criminal sexual abuse or attempt to commit  criminal sexual abuse.  "When the defendant makes a timely objection to the PSR, if the sentencing court chooses to make a finding with respect to the disputed facts, it must do so on the basis of evidence, and not the PSR."  See United States v. Poor Bear, 359 F.3d 1038, 1042 (2004).  Uncharged, dismissed, and acquitted conduct may be used for sentencing purposes if proved by a preponderance of the evidence.  See United States v. Magallanez, 408 F.3d at 684-85.  Sandoval objected to the paragraphs of the PSR presenting relevant and other relevant conduct.  The Court, therefore, must look for evidence beyond the PSR.  The Addendum states that the Court can consider the evidence that was adduced at trial pertaining to the conduct alleged in Count 1 and Counts 3-8 of the Redacted Second Superceding Indictment.  The Court believes, however, that the evidence

---

[3] At the hearing, the Court stated that the plain language of the cross-reference provides that it is operative when the conviction offense involved criminal sexual abuse or attempt to commit criminal sexual abuse.  See Hearing Transcript at 19:18-20:1 (Court).  The Court is no longer of that opinion.  After the hearing the Court located U.S.S.G. § 1B1.1, which provides:

"Offense" means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context.  The term "instant" is used in connection with "offense," "federal offense," or "offense of conviction," as the case may be, to distinguish the violation for which the defendant is being sentenced from a prior or subsequent offense, or from an offense before another court (e.g. an offense before a state court involving the same underlying conduct).

U.S.S.G. § 1B1.1.

does not support a finding that Sandoval's offense involved criminal sexual abuse or attempt to commit criminal sexual abuse. Jane Doe's testimony at trial was too ambiguous for the Court to find that Sandoval's conduct amounted to criminal sexual abuse or attempt to commit criminal sexual abuse. Also, other than Bedoni's testimony about what she directly observed on September 1, 2004 -- upon which they jury may have relied in rendering its guilty verdict on the lesser included offense of abusive sexual contact on or about September 1, 2004 -- any information received from Bedoni and Witt about the alleged offenses was necessarily hearsay. In light of the Court's dismissals and the jury's verdicts, the Court cannot reasonably regard the hearsay as reliable hearsay information. The Court, therefore, cannot use that hearsay evidence to find by a preponderance of the evidence that Sandoval's conduct involved criminal sexual abuse or attempt to commit criminal sexual abuse.

With respect to Jane Doe B, the Court does not believe it is in a position to find that the alleged conduct occurred by a preponderance of the evidence. The Court notes that it allowed the facts concerning Jane Doe B to be admitted via pretrial order, and that Jane Doe B did not come to testify. The Court would find it troubling to find by a preponderance of the evidence information about which a witness refused to testify. Considering the foregoing, the Court will sustain Sandoval's objection regarding use of the cross-reference.

**B.     THE PROPER OFFENSE LEVEL CALCULATION.**

Sandoval contends that the offense level should be 16. Sandoval arrives at that level by starting with a base offense level of 10, based upon § 2A3.4(a)(3), which the USPO used in preparing the PSR. See Sentencing Memo at 6. Sandoval states that 4 levels should be added, pursuant to special offense characteristic (b)(1), which concerns the victim's age, to the base level of 10. See id. Sandoval also states that § 2A3.4(b)(1) requires an increase of the offense level from 14 to 16,

-26-

because the offense level that would result otherwise is less than 16.  See id.

Sandoval also urges the Court to consider that Jane Doe had not been "entrusted to the defendant" as § 2A3.4(b)(3) contemplates.  Sandoval argues that, in light of the verdicts acquitting him of any offense in June 2004, the reference in the Addendum recommending application of special offense characteristic § 2A3.4(b)(3), based upon Sandoval's custody of Jane Doe in June 2004, is inappropriate.  See Defendant's Objections II at 3.  Sandoval argues that, if the Court accedes to his arguments about the base offense level, special offense characteristic § 2A3.4(b)(3), regarding whether Jane Doe had been "entrusted to the defendant," is rendered academic by § 2A3.4(b)(1), which requires an increase of the offense level from 14 to 16 if the resulting offense level is less than 16.  See id.

The United States urges the Court to increase the base offense level pursuant to the enhancement § 2A3.4(b)(3).  See Response at 3.

Application Note 2 of U.S.S.G. § 2A3.1, states that the Court should look at the actual relationship that existed between the defendant and the victim when determining whether to apply § 2A3.1(b)(3)(A).  See U.S.S.G. § 2A3.1, app. n. 2.  In this case, the victim is Sandoval's biological daughter, with whom he shared  permanent residency and whom he financially supported.  In United States v. Miller, 293 F.3d 468 (8th Cir. 2002), the United States Court of Appeals for the Eighth Circuit held that § 2A3.5(b)(3)'s enhancement applied because the defendant was the victim's "Dad" – the defendant lived with the victim's mother as husband and wife, the victim referred to the defendant as "Dad," and the defendant referred to the victim as his "child."  293 F.3d at 471-72.  The Court believes, based upon United States v. Miller, that § 2A3.1(b)(3)(A) takes parents as a starting point for evaluating who is in custody, care, and control of the victim, and that it does not require that

-27-

parents have any additional "entrustment."   Accordingly, the Court finds that § 2A3.1(b)(3)(A)'s two-level enhancement applies.

Based on that assessment, the Court finds that Sandoval's Total Offense Level should be 18. General Application Principle U.S.S.G. § 1B1.1(b), states: "Determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline in Chapter Two in the order listed."   U.S.S.G. § 1B1.1(b). Accordingly,  under § 2A3.4, Sandoval's base offense level is 10, see U.S.S.G. § 2A3.4, which is enhanced to level 16 because Jane Doe was less than twelve years old, see U.S.S.G. § 2A3.4(b)(1), which is enhanced another 2 levels to 18 because Jane Doe was in Sandoval's custody, care, and supervisory control, see U.S.S.G. § 2A3.4(b)(3).   See also United States v. Meacham, 115 F.3d 1488, 1497 (1997)(applying the guideline provisions in the same manner to a similarly situated defendant).  Thus, the proper offense level for Sandoval is 18.

## III.    THE COURT WILL DENY THE UNITED STATES' MOTION FOR AN UPWARD DEPARTURE.

In response to the Court's conclusion that the cross-reference is inapplicable, the United States requests the Court depart upward to an offense level of 25.  See Upward Departure Motion at 1.  The United States argues that, pursuant to U.S.S.G. § 5K2.21, Sandoval's dismissed and uncharged conduct supports a higher adjusted offense level than 18.  See id. at 1.  Specifically, the United States requests that the Court consider the facts associated with Count 6, which involved contact between Sandoval's penis and Jane Doe's mouth, and was dismissed because of the difficult time Jane Doe had testifying at the trial.  See id. at 3.  The United States also urges the Court to consider the facts associated with the uncharged conduct involving Jane Doe B.  See id. at 4.

The Court will not grant the United States' request for an upward departure.  Under the facts and circumstances of this particular case, where so much of conduct that the United States references relates to counts that were either not submitted to the jury for various evidentiary reasons or the jury did not find beyond a reasonable doubt, the Court believes that it should be very cautious about using such conduct to increase Sandoval's sentence, particularly as dramatically as the United States requests.  The Court also notes that it allowed the facts concerning Jane Doe B to be admitted via pretrial order, and that Jane Doe B did not come to testify.  The Court, moreover, has trouble distinguishing this case from other sex crimes cases that it and other federal courts come across regularly.  Even if departure were warranted under the facts and circumstances of this case, the Court would exercise its discretion not to depart, because, despite this case's sadness, it believes that it still remains within the heartland of cases.  Considering the foregoing, the Court will not grant the United States' Motion for Upward Departure.

**IT IS ORDERED** that the Defendant's Statement of Objections to Pre-sentence Report and Addendum Disclosed September 27, 2006 is granted in part and denied in part; the Court sustains Sandoval's objection to the use of U.S.S.G. § 2A3.4(c)(1) in determining his offense level and overrules his other objections.  The Court denies the United States' request for an upward departure.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
  United States Attorney for the District of
    New Mexico
Samuel L. Winder
  Assistant United States Attorney for the
    District of New Mexico
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Charles Fisher
Allison & Fisher
Albuquerque, New Mexico

       *Attorney for the Defendant*